NOT FOR PUBLICATION                                    (Doc. Nos. 129, 130)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| ESTATE OF HARRISON, et al., | : | |
| | : | |
| Plaintiffs, | : | Civil No. 12-6683 (RBK/KMW) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| TRUMP PLAZA HOTEL & CASINO, et al., | : | |
| | : | |
| Defendants. | : | |

**KUGLER**, United States District Judge:

This suit arises out of the untimely and tragic death of Brian Harrison.[1] Presently before the Court are two motions for summary judgment: one of Plaintiffs Irwin E. Harrison, as Executor of the Estate of Brian D. Harrison, and Irwin E. Harrison and Ilene Harrison, individually, (collectively referred to herein as "Plaintiffs"), and another of Defendants Adam Good, LLC d/b/a Firewaters ("Firewaters") and Hoot Owl Restaurants, L.L.C. ("Hoot Owl"). The Court notes that Defendants Trump Plaza Associates d/b/a Trump Plaza Hotel & Casino ("Trump Plaza") and ABC Corp. have not moved for summary judgment.  The Court previously dismissed Defendant Café Sbarro Atlantic City LLC's ("Sbarro") motion for summary judgment as untimely.  (See Doc. No. 143 (dismissing Sbarro's motion for summary judgment because it was filed twenty-six days late); see also Doc. No. 150 (denying Sbarro's motion for

---

[1] This Court exercises diversity jurisdiction pursuant to 28 U.S.C. § 1332.

reconsideration).)   For the foregoing reasons, Plaintiffs' Motion for Summary Judgment (Doc.

No. 130) is DENIED, and Firewaters' and Hoot Owl's Motion for Summary Judgment (Doc. No.

130) is GRANTED.

## I.       Factual Background

The Court interprets the facts in the light most favorable to the nonmoving party.[2]

On January 28, 2012, twenty-two year old Brian Harrison ("Brian") and approximately

ten of his friends went to Atlantic City to celebrate their friend Jeffrey Miller ("Miller") entering

the United States Army.  (Pls.' SMF ¶ 1.)  They arrived in Atlantic City at approximately 4:30

p.m. and checked into their two rooms at the Trump Plaza Hotel & Casino, where they had a few

drinks.  (Pls.' SMF ¶ 2.)  At least one of Brian's friends remembers him having a beer or two and

a shot of whiskey.  (Sherman Dep. 18:15–20, Pls.' Ex. A, Doc. No. 135.)   After having dinner

on the boardwalk and briefly returning to the hotel room, they then went to a bar in the Trump

Plaza Hotel for forty-five minutes.  (Mueller Dep. 47:15–48:14, Def.'s Ex. C.)  Shortly

thereafter, the friends went to the Wild West Bar, where, according to Brian's friend Steven

Sherman ("Sherman"), Brian and his friends each had a drink.  (Sherman Dep. 23:21–24:3, Pls.'

Ex. A, Doc. No. 135.)

Sometime between 11:30 p.m. and 11:45 p.m., after splitting with the rest of their group,

Brian and Lucas Irwin ("Irwin"), Andrew Slocum ("Slocum"), Tyler Reppert ("Reppert"), and

Sherman arrived at Firewaters.  (Irwin Dep. 20:11–21, Def.'s Ex. D; Sherman Dep. 26:11–13.)

While at Firewaters, Brian ordered himself two beers beers.  (Irwin Dep. 21:17–21; see also

Sherman Dep. 26:22–27:1.)  At one point, Irwin bought a round of shots for himself, Reppert,

---

[2] Trump Plaza denies many facts set forth by Plaintiffs in their statement of undisputed material facts, but fails to cite to any exhibits within the record to support their denial as required by Local Rule 56.1.  Although this is grounds for admitting the factual assertions, the Court has looked to the Record to determine whether Plaintiffs' assertions are supported.

and Slocum, but did not buy one for Brian, whom he characterized as "not a shot taker." (Irwin Dep. 21:6–15.) Sherman, however, remembers Brian having a "test-tube shot." (Sherman Dep. 26:22–27:1.) Irwin, who saw Brian order his drinks from the bar, did not notice Brian exhibiting any signs of intoxication. (Irwin Dep. 42:3–43:17.) Sherman remembers him slurring his words more than usual, but has no recollection of when Brian was slurring his words. (Sherman Dep. 74:7–75:4.) He also noticed that Brian was "able to stand up, talk, hold a conversation without slurring his words too much" and was not stumbling over too much. (Id. 27:12–16.)

Sometime between 12:30 a.m. and 1:30 a.m., Brian and Sherman left Firewaters and walked back to Trump Plaza. (Id. 26:17–27:4, 45:23–25.) Security footage from Trump Plaza from approximately 1:30 a.m. to 2:29 a.m. shows Brian and Sherman walking through Trump Plaza and stopping for a half an hour to watch Miller gamble, and then Brian walking throughout Trump Plaza by himself, entering and exiting Sbarro, and stopping by a slot machine. (Def.'s Ex. E.) The footage last shows him entering Sbarro a second time around 2:29 a.m. (Id.)

Sbarro is located on the second flood of Trump Plaza's Transportation Center. (Pls.' SMF ¶ 20.) Its rear emergency exit provides access to the "man-lift" in Trump Plaza's valet parking garage. A man-lift is a lifting system that operates on a constantly rotating belt, allowing people to access floors more quickly because it does not stop at each floor. (Pls.' SMF ¶ 13.) Trump Plaza's valet workers used it to efficiently reach the five floors on which cars are parked. (Pls.' SMF ¶ 15.) The manlift area is accessible via Sbarro's rear exit—the only other exit in the café besides the front entrance. (Pls.' SMF ¶ 21; Police Report, Pls.' Ex. B, Doc. 130.) This rear exit—located directly adjacent to the bathroom—is a steel door marked with "Emergency Exit Only" and "WARNING Alarm." (Pls.' Ex. E., Doc. No. 135; Def.'s Ex. H, Doc. No. 129.) An alarm is installed to alert Sbarro's employees should any customers open the door. Once you

exit Sbarro's, the area in which the man-lift is located is approximately twenty-seven feet in length by nine feet in width, with the man-lift located at the far end of the space.  (See Malanga Rep., Pls.' Ex. F at 2, 6, Doc. No. 1330.)  Within the man-lift area are signs that state "DO NOT RIDE MANLIFT OR POLE" and "RESTRICTED AREA AUTHORIZED EMPLOYEES ONLY."  (Def.'s Ex. B, Doc. No. 136.)

At 2:51 a.m., Trump Plaza employee Robert Duenski ("Duenski) entered the man-lift area from the ground floor when he heard moaning above him and discovered Brian lying adjacent to the man-lift on the first floor.  (Pls.' SMF ¶ 9; Pls.' Exs. B, C.)  Duenski left the area to call for help and was waiting for security to arrive when he heard two loud bangs from inside the man-lift area.  (Pls.' Ex. C.)  When the security officer arrived, he and Duenski went into the man-lift area and saw Brian lying two floors—or approximately twenty-six feet—below where Duenski had last seen him.  (Pls.' Ex. C; Malanga Rep. at 6, Pls.' Ex. F.)  Brian, unresponsive and bleeding from his head, was taken to Atlantic City Medical Center, where he died on February 1, 2012 from critical skull fractures.  (Pls.' Ex. B; Pls. SMF ¶ 12.).  The parties agree that Brian accessed the man-lift area through Sbarro's rear emergency exit door.  An investigation conducted after the incident revealed that Sbarro's emergency exit door opened from the inside without activating the alarm and alerting the employees.  (Pls.' SMF ¶ 25.)

Before the Court are two motions for summary judgment.  Plaintiffs move for summary judgment on Trump Plaza's negligence, and Trump Plaza opposes.  Defendants Firewaters and Hoot Owl move for summary judgment on Plaintiffs' Dram Shop Claim.  Both Plaintiffs' and Defendant Sbarro's oppose.  Having been briefed by the parties, the issues are now ripe for the Court's review.

## II.    LEGAL STANDARD

The Court should grant a motion for summary judgment when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "material" to the dispute if it could alter the outcome, and a dispute of a material fact is "genuine" if "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Matsushita Elec. Indus .Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'") (quoting First Nat'l Bank of Az. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)). In deciding whether there is any genuine issue for trial, the court is not to weigh evidence or decide issues of fact. Anderson, 477 U.S. at 248. Because fact and credibility determinations are for the jury, the nonmoving party's evidence is to be believed and ambiguities resolved in its favor. Id. at 355; Matsushita, 475 U.S. at 587.

Although the movant bears the burden of demonstrating that there is no genuine issue of material fact, the non-movant likewise must present more than mere allegations or denials to successfully oppose summary judgment. Anderson, 477 U.S. at 256. The nonmoving party must at least present probative evidence from which the jury might return a verdict in its favor. Id. at 257. The movant is entitled to summary judgment where the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

III.    DISCUSSION

### A. Plaintiffs' Negligence Claims Against Trump Plaza[3]

Plaintiffs move for summary judgment, arguing that Trump Plaza breached its duty of care to Brian by maintaining the man-lift in violation of the applicable safety regulations.  At the time of Brian's accident, Trump Plaza was required to comply with New Jersey's "Elevator Safety Subcode,"  see N.J.A.C. § 5:23-12, which purports to "enhance the public safety, health and welfare by ensuring that elevator devices . . . are periodically inspected and maintained in accordance with nationally recognized, referenced standards."  N.J.A.C. § 5:23-12(d).  This Subcode applies to the maintenance of man-lifts, such as the one involved here, see id. § 5:23-12(e), and requires that they be maintained "in accordance with the most recent edition of ASME A17.1, ASME A18.1, or ASME A90.1 referenced in the building subcode."[4]  Id. § 5:23-12.2(a)–(b).  In effect at the time of this incident was the 2003 edition of ASME A90.1, in which Section 4.5.6 establishes the following requirement:  "Manlifts shall not be available to the general public.  If located in buildings to which the public has access, manlifts shall be located in an enclosure protected by self-closing, spring-locked doors.  Keys to such doors shall be limited to authorized personnel."  (Pls.' SMF ¶¶ 52–54.)  Section 4.5.1 of A.90.1 also requires that,

> [t]he entrances and exits at all floor landings affording access to the manlift shall be guarded by a maze (staggered railing) or handrail equipped with self-closing gates. . . . The guardrails shall be located a minimum of 2 ft (610 mm) from the edge of the floor opening on those used as landings.

(Pls.' Exs. J., N.)

---

[3] Plaintiffs have not specified on which negligence Count they are moving for summary judgment.  However, for reasons expressed herein, the Court finds this oversight or failure unimportant at this juncture.
[4] ASME stands for "American Society of Mechanical Engineers."

Plaintiffs argue that Trump Plaza was in direct violation of ASME 90.1 because the man-lift area was accessible to the public through Sbarro's rear exit door but was not enclosed in any "self-closing" or "spring-locked" doors as required by Section 4.5.6, and was not guarded by any type of maze or rail as required by Section 4.5.1. (Pls.' Br. 12–13.)  In support of their argument, Plaintiffs have offered the expert opinion of Daniel Honig, P.E., who came to the following conclusion:

> At the time of the incident, the public not only had access to the manlift's second floor entry/exit area, but the door and accessibility modifications resulted in completely unguarded manlift floor openings.  Regardless of public accessibility, manlift entry/exit areas are required to be protected in accordance with Section 4.5.1. . . .

(Pls.' Ex. J at 21.)

Trump Plaza opposes Plaintiffs' motion, arguing that multiple material issues of disputed fact require that the case go to a jury.  In support thereof, it has offered the expert opinion of Professional Engineer Robert Malanga ("Malanga"), whose report concludes that Trump Plaza maintained the man-lift in accordance with ASME regulations and all other regulations in effect at the time. (Def.'s Opp. Br., Ex. E at 11.)  Malanga opines that the man-lift was maintained in accordance with ASME Section 1.4, which states the following:  "In case of practical difficulty or unnecessary hardship, the enforcing authority may grant exceptions from the literal requirements of this Standard or permit the use of alternative methods, but only when it is clearly evidence that equal safety is thereby secured." (Id.)  His conclusion is based on the periodic inspections of the man-lift area by New Jersey's "Elevator Safety Unit," which typically occurred on a semi-annual basis and as recent as approximately six months before Brian's unfortunate death.  He also cites the certificates of compliance issued for the man-lift, which were also issued on a regular basis. (Id. at 7.)

7

The Court agrees with Trump Plaza that it cannot grant summary judgment in light of the factual issues still in dispute.  The Court is faced with competing expert opinions as to whether Trump Plaza maintained the man-lift area in accordance with the applicable regulations.  It is not the Court's function to determine whose expert is more credible or to determine whether, in light of the factual evidence, the man-lift area was in compliance with the regulations.  See Anderson, 477 U.S. at 248.  Rather, this issue lies squarely within the province of the jury, see id. at 255, and therefore, as the non-moving party, Trump Plaza's evidence is to be believed.  In light of this material issue of disputed fact, summary judgment against Trump Plaza would be inappropriate.  Plaintiffs' motion for summary judgment is denied.

### B.  Plaintiffs' Dram Shop Claim

Firewaters and Hoot Owl move for summary judgment on Plaintiffs' claim brought against it pursuant to the New Jersey Licensed Alcoholic Beverage Server Fair Liability Act, or New Jersey's Dram Shop Act.  They contend that there is no evidence in the record showing that Firewaters served Brian when he was visibly intoxicated or that he was visibly intoxicated at all.  They also argue that that any service of alcohol to Brian was not the proximate cause of his unfortunate death.  Finally, Hoot Owl argues that Plaintiffs' claims against it should be dismissed because it does not own, operate, or control Firewaters.  Plaintiffs argue that a material issue of disputed fact precludes summary judgment.

The Dram Shop Act in New Jersey provides that,

a. A person who sustains personal injury or property damage as a result of the negligent service of alcoholic beverages by a licensed alcoholic beverage server may recover damages from a licensed alcoholic beverage server only if:
   (1) The server is deemed negligent pursuant to subsection b. of this section; and
   (2) The injury or damage was proximately caused by the negligent service of alcoholic beverages; and

> > (3) The injury or damage was a foreseeable consequence of the negligent
> > service of alcoholic beverages.
> b. A licensed alcoholic beverage server shall be deemed to have been negligent
> only when the server served a visibly intoxicated person, or served a minor,
> under circumstances where the server knew, or reasonably should have
> known, that the person served was a minor.

N.J. Stat. Ann. § 2A:22A–5 (emphasis added).  To establish liability under the Dram Shop Act, a

plaintiff must prove, *inter alia*, that the licensed alcoholic beverage server served an alcoholic

beverage to a "visibly intoxicated person."  The act defines visibly intoxicated as "a state of

intoxication accompanied by a perceptible act or series of acts which present clear signs of

intoxication."  Id. § 2A:22A–3.

The Supreme Court of New Jersey has made clear that a plaintiff does not need to

produce eyewitness testimony to prove that a person was served alcohol while he or she was

visibly intoxicated.  See Halvorsen v. Villamil, 60 A.3d 827, 831 (N.J. 2013).  Rather, a plaintiff

may defeat a motion for summary judgment in a dram shop case by presenting "sufficient direct

or circumstantial evidence that would permit a jury to reasonably and legitimately deduce that a

beverage server served alcoholic beverages to the person at issue while he or she was visibly

intoxicated."[5]  Id. at 832.  Thus, the question for the Court to consider is whether Plaintiffs'

proofs are sufficient to create a material issue of fact that Brian was visibly intoxicated when he

was served at Firewaters.

The New Jersey Supreme Court in Halvorsen considered, whether absent eyewitness

testimony, the plaintiffs had provided sufficient evidence to overcome summary judgment.

There, the plaintiffs were injured after being involved in a car accident with the Defendant

Villamil, who was intoxicated and had just come from drinking at T.G.I. Friday's.  60 A.3d at

---

[5] New Jersey's summary judgment standard and the standard in this Court are effectively the same.  See Brill v.
Guardian Life Ins. Co. of America, 666 A.2d 146, 156 (adopting the United States Supreme Court's summary
judgment standard established in Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)).

829–30.   To defeat defendants' motion for summary judgment, plaintiffs offered the expert

opinion that "within a reasonable degree of scientific certainty [,] T.G.I. Friday's served Villamil

an alcoholic beverage while he was visibly intoxicated."  60 A.3d at 833.  Although the expert

testimony did not on its own create an issue of material fact, it in conjunction with other

circumstantial evidence was successful in defeating summary judgment.   The Halvorsen court

explained its reasoning:

> We do not conclude that Dr. Saferstein's expert report alone creates a genuine
> issue of material fact on the visible intoxication issue.  We do conclude, however,
> that Dr. Saferstein's opinions, when combined with the direct and circumstantial
> evidence of record—Villamil's testimony that he only drank alcoholic beverages
> at T.G.I. Friday's, the short time period between Villamil leaving T.G.I. Friday's
> and his erratic driving that caused the accident, Villamil telling paramedics he felt
> no pain despite sustaining serious injuries, and Villamil's extremely high blood
> alcohol content—would allow a jury to reasonably and legitimately deduce that
> T.GI. Friday's served Villamil an alcoholic beverage while he was visibly
> intoxicated.  We find the record sufficient to create an issue of material fact for
> the jury to resolve.

Id. at 834.

As evidence of Brian's visible intoxication, Plaintiffs present Sherman's deposition

testimony and the expert opinion of Dr. Pandina.  Sherman testified that he witnessed Brian

slurring his words at some point while they were at Firewaters.  (See Sherman Dep. 74–75.)  He

otherwise does not remember Brian exhibiting any additional signs of intoxication, including at

the time Brian purchased his alcoholic beverages.  (See id. 27:13–16; 50–57; 74:22–75:4.)

Plaintiffs also rely on the expert report of Dr. Pandina, who opines that Brian's blood alcohol

level ("BAC") was approximately .18% at time of last service at Firewaters, and that slurred

speech is one of many "perceptible sign[s] associated with intoxication."  (Pls.' Opp. Br., Ex. C

at 6.)  However, Dr. Pandina stops short of concluding that Brian was visibly intoxicated when

he was served at Firewaters.  Indeed, in his deposition testimony, he stated that he *could not*

*conclude* that Brian was visibly intoxicated when he purchased the alcoholic beverages from Firewaters.  (Def.'s Ex. G, 66:22–67:13.)

The Court finds Plaintiffs' proofs insufficient to create a genuine issue of material fact as to Brian's visible intoxication.  Although the lack of eyewitness testimony as to Brian's visible intoxication at the time of service is not required, Plaintiffs must provide other evidence—either direct or circumstantial—that Brian was visibly intoxicated when he purchased his beverages from Firewaters.  Unlike the plaintiffs in Halvorsen, Plaintiffs have not presented an expert opinion concluding that Brian was visibly intoxicated when he was served at Firewaters.  Moreover, Sherman's testimony does not identify Brian as visibly intoxicated at the time he was served his alcoholic beverages.  In fact, Sherman states repeatedly in his deposition that he has no independent recollection of whether Brian was slurring his words while he was ordering beverages at Firewaters.  This equivocal testimony is not enough to create a genuine issue of material fact.  Lastly, the circumstantial evidence of Brian's visible intoxication is also much less than that presented in Halvorsen.  Brian's accident took place nearly one hour after he left Firewaters, whereas in Halvorsen the accident took place just twenty minutes after Villamil left T.G.I. Friday's.  In Halvorsen, multiple witnesses at the scene of the accident testified that Villamil was heavily intoxicated and was acting so, whereas here, there are no witnesses who saw Brian acting intoxicated.  In sum, the Court finds that the evidence does not create a genuine issue of material fact.  As such, Defendant Firewaters and Hoot Owl's motion for summary judgment is granted.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment against Trump Plaza is **DENIED** and Defendants Firewaters and Hoot Owl's motion for summary judgment is

**GRANTED.**  This case shall proceed to trial to determine the liability of Trump Plaza and

Sbarro's for Brian's death.


Dated: 1/28/2016                                          s/Robert B. Kugler
                                                         ROBERT B. KUGLER
                                                         United States District Judge